[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
February 13, 2008
THOMAS K. KAHN
CLERK

_____

No. 07-11811
Non-Argument Calendar

_____

D. C. Docket No. 05-00188-CR-ORL-22KRS

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DARLENE BLOWE,
EZRA HAYNES,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Middle District of Florida

_____

**(February 13, 2008)**

Before TJOFLAT, BIRCH and BLACK, Circuit Judges.

PER CURIAM:

Darlene Blowe and Ezra Haynes appeal their convictions for conspiracy to distribute cocaine, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A)(ii); conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) and money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and (a)(1)(B)(i), and § 2. Blowe argues that the evidence was insufficient to support her convictions. Haynes argues that the district court erred by instructing the jury on deliberate ignorance. After reviewing the record and the parties' briefs, we discern no reversible error and AFFIRM the convictions.

## I. BACKGROUND

A federal grand jury issued an eight-count indictment against eight defendants, including Blowe and Haynes, arising out of the operation of an alleged criminal organization, referred to in the indictment as the Black Mafia Family ("BMF"). Count One charged Blowe, Haynes, and other codefendants with conspiracy to commit money laundering by transporting or aiding and abetting the transportation of drug proceeds, in violation of 18 U.S.C. § 1956(h), (a)(1)(A)(i), and (a)(1)(B). Count Two charged Blowe, Haynes, and other codefendants with conspiracy to distribute five kilograms or more of cocaine hydrochloride, in violation of 21 U.S.C. §§ 846 and 841(a)(1) and (b)(1)(A)(ii). Count Three charged Blowe and other codefendants with money laundering arising from the

transportation of approximately $66,850, representing the proceeds of an unlawful activity, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and (a)(1)(B)(1), and § 2. Count Five charged Blowe and other codefendants with conducting an unlicensed money transmitting business, in violation of 18 U.S.C. §§ 1960 and 2. Count Six charged Haynes and another codefendant with money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and (a)(1)(B)(i) and § 2. Count Seven charged Haynes and another codefendant with conducting an unlicensed money transmitting business, in violation of 18 U.S.C. §§ 1960 and 2.

At trial, the government called Danny Anderson, a task force agent for the Drug Enforcement Agency ("DEA"), who testified that the BMF was in the business of trafficking cocaine hydrochloride and used the proceeds of this business to live a luxurious lifestyle. According to Anderson's testimony, the BMF advertised itself as a rap record label with its own magazine, but Anderson was unaware of any concerts or legitimate business activities of the BMF. The main targets of his Orlando-based investigation of the BMF were William Charles Marshall, Doren Fiddler, and Mark Whaley. Marshall was the Chief Financial Officer ("CFO") of BMF. Whaley leased high-end vehicles to BMF members from Marshall's car rental business. Haynes acted as security and as an assistant for Marshall. On 17 June 2005, after conducting surveillance and coordinating

3

with the Columbia County Sheriff's Office, law enforcement agents pulled over Blowe and Fiddler as they were driving north from Orlando to Atlanta and discovered a large amount of currency hidden in the vehicle. Anderson testified that BMF members always put their vehicles, properties, accounts, and telephones in other people's names to avoid detection by law enforcement.

The government called Marshall as a witness, and he testified that, at the time of trial, he was incarcerated for distributing cocaine and for money laundering. He handled the majority of the finances for the BMF, and the record label was a front to allow the BMF to hide and distribute the cocaine proceeds. He listed several individuals who worked for him, including Blowe. Fiddler worked directly for Marshall as a manager responsible for distributing cocaine out of Orlando, and Whaley was responsible for the high-end luxury cars distributed to various BMF members around the country.

Marshall testified that he hired Blowe to handle the travel aspects of the BMF's operation, but her role eventually grew until she was performing all of the BMF's clerical and administrative work, such as paying the bills of BMF members and dropping off drug proceeds for Marshall. Blowe took initiative and improved the business by changing the previous BMF spreadsheet and depositing drug proceeds into multiple accounts – using her own personal bank accounts and the

4

account of a newly created business – in order to avoid detection by law enforcement.  In May 2005, Blowe offered to make a trip to pick up drug proceeds.  The following month, Marshall sent Blowe to Orlando to drive Fiddler and approximately $66,000 back to Atlanta.  Blowe told Marshall that she had been stopped by law enforcement and that they found the money in the car.  According to Marshall, Blowe knew the money involved was drug proceeds, because he had conversations with Blowe specifically about drugs in relation to her administrative work, and on one occasion in early 2004, Blowe witnessed Marshall sell cocaine.  Further, on numerous occasions, Blowe knowingly rented certain trucks with hidden compartments to allow for the transportation of the drug proceeds without detection, and Marshall provided Blowe with a cover story to tell law enforcement if they were ever caught transporting large amounts of money.

Marshall testified that Haynes's primary role was to act as security for Marshall, but he also took care of "just about everything" as Marshall's right-hand man.  R3 at 48.  Haynes worked for Marshall for approximately two years, lived with Marshall in his various homes, and spoke with Marshall nearly every day during that period.  Haynes transported drug money for Marshall on four occasions, including instances where he delivered $50,000 to Marshall's boss in March 2004, and where he delivered $40,000 a few months later to the same

location. The third such occasion occurred in March 2005, when Haynes picked up over $50,000 from Fiddler in Orlando and returned it to Marshall in Atlanta. In August 2005, Marshall sent Haynes again to Orlando to pick up approximately $55,000 from Fiddler, but DEA agents spotted Haynes getting off the airplane in Atlanta and confiscated the money. Marshall did not instruct Haynes to put in a claim for the loss due to the origin of the money. Marshall blamed Fiddler for the loss, and, with Haynes standing by his side, Marshall called Fiddler on the telephone and told him that Fiddler needed to get out of the drug business. In February 2004, Haynes observed a kilogram of cocaine that Fiddler had carelessly left out, and, in November 2003, Haynes observed over $100,000 and four kilograms of cocaine in a floor safe of Marshall's Atlanta home.

The government then called Fiddler as a witness. He had already pled guilty in this case but was awaiting sentencing. Fiddler testified that he deposited drug proceeds into Blowe's accounts, and Blowe was the administrator of BMF who took care of all of the bills. In June 2005, Blowe was sent to Orlando to drive Fiddler and a large sum of money back to Atlanta because Fiddler was a bad driver and fell asleep on the road.[1] As Blowe drove to Atlanta with Fiddler and $60,000 –

---

[1] Blowe had received money from Fiddler at least one other time in late 2002 or early 2003. On that occasion, Blowe counted roughly $80,000 to $100,000 and delivered it to a BMF member named Slim.

which Fiddler had hidden in a compartment in the rental vehicle – the police pulled the car over and confiscated the money. Fiddler testified that Blowe did not know that the money was in the truck, and she had previously told him that she did not want to know what was in the car.

Fiddler testified that Haynes worked as security for BMF and Marshall. In August 2005, Marshall sent Haynes to Orlando to help bring back money to Atlanta, and Marshall called Fiddler and blamed him for Haynes getting picked up at the airport in Atlanta by the police, who found the money on his person. Marshall called Fiddler again about the incident when Haynes was present with Marshall, and Marshall threatened to fire Fiddler on the telephone.

The government called Leonard Purvines, the DEA task force officer who stopped Haynes at the Atlanta airport in August 2005. Purvines testified that Haynes was carrying approximately $57,000 underneath his clothing, which Haynes said was given to him by an unidentified man in Orlando. In response to a direct question, Haynes told Purvines that he believed that the money was "probably" drug money. R4 at 102, 115. Internal Revenue Service special agent Susan Stephens, who arrested Haynes in October 2005, testified that Haynes told her that he recalled two occasions where he carried money for Marshall, one of which was the June 2005 trip involving the loss of $57,000. Haynes told her that

7

he had no knowledge of where the money came from. Finally, the government called officer Cecil Brownfield of the Columbia County Sheriff's Office, who testified regarding the traffic stop involving Blowe and Fiddler on 17 June 2005 and his discovery of the money hidden in a wheel compartment of the car.

Both Blowe and Haynes moved for judgments of acquittal under Federal Rule of Criminal Procedure 29 on the basis of insufficient evidence. The court denied their motions with respect to the money laundering conspiracy, cocaine distribution conspiracy, and substantive money laundering counts. The court dismissed the unlicensed money transmitting business charges against Blowe in Count 5 and against Haynes in Count 7.

Blowe testified that her duties for Marshall included organizing and paying bills for Marshall and his friends, paying Marshall's house payments, and making travel arrangements. Though Marshall told her that he was dealing with cars, but she did not have an understanding of his business. She denied knowing that any money was concealed in the car when she was stopped in June 2005. Marshall never asked her to carry cocaine, she never transported money for him, she never heard him use the word "cocaine," and she never saw cocaine around Marshall or Fiddler.

Haynes testified on his own behalf. According to Haynes, he initially

provided security services for Fiddler, who had told Haynes that he worked for BMF in the entertainment business. Haynes attended BMF functions at various nightclubs in Orlando and Atlanta and understood BMF to be a legitimate record label. He had never seen cocaine before, he had never transported money between Atlanta and Florida, and Marshall had never told him to take money from Orlando to South Florida. Later, when he worked for Marshall in Atlanta, his job consisted of taking Marshall's sons to get haircuts, washing the cars, taking care of the dogs, going to the grocery store, and providing security at nightclubs. Marshall asked him to go to Orlando in August 2005 to meet with Fiddler but did not say why. While there, Fiddler gave Haynes $57,000, which Fiddler said was for a concert in Atlanta. That money was seized when he got off the airplane in Atlanta. Haynes denied that he told Purvine that he thought the money was probably drug money. Haynes testified that he thought that the money was for a BMF party in Atlanta and did not suspect that it was drug money. He testified that he had never heard Marshall speak about drugs in his presence, and denied that Marshall called Fiddler on the telephone after the police seized the $57,000. Haynes stated that he did not count the money in Orlando before getting on the airplane to Atlanta, denied that he knew that any money was drug proceeds, and denied picking up money several times for Marshall.

After closing arguments, counsel for Haynes renewed his motion for a judgment of acquittal, which the district court again denied. The parties discussed proposed jury instructions with the district court, and counsel for Haynes objected to the government's proposed deliberate ignorance instruction, arguing that there was no evidence presented that Haynes took any efforts to avoid knowledge of a conspiracy. The district court found that the instruction would likely be appropriate with respect to Count Two regarding the conspiracy to distribute cocaine. The district court instructed the jury that, in order to convict Blowe on the substantive money laundering count, the government had to prove either a promotion or a concealment theory, as set out in the indictment.

The jury returned a guilty verdict against Blowe for conspiring to commit money laundering, conspiring to distribute cocaine, and money laundering. The jury found Haynes guilty of conspiring to commit money laundering, conspiring to distribute cocaine, and money laundering. Haynes filed motions for a new trial and a judgment of acquittal, which the district court denied. The district court entered judgment against Blowe and sentenced her to 120 months of imprisonment. The district court entered a judgment against Haynes and sentenced him to 60 months of imprisonment. These appeals followed.

## II. DISCUSSION

A.  The Evidence Was Sufficient to Support Blowe's Convictions

Whether the record contains sufficient evidence to support a jury's verdict is a question of law that we review de novo.  United States v. Silvestri, 409 F.3d 1311, 1327 (11th Cir. 2005).  "[W]e examine the evidence in the light most favorable to the government, drawing all reasonable inferences and making all credibility choices made in the government's favor."  Id.  "[W]e will not disturb a guilty verdict unless, given the evidence in the record, no trier of fact could have found guilt beyond a reasonable doubt."  Id. (quotation omitted).  To obtain a conviction for conspiracy to distribute cocaine, the evidence must establish beyond a reasonable doubt that:  (1) a conspiracy existed; (2) the defendant knew of the conspiracy; and (3) the defendant voluntarily joined the conspiracy.  United States v. Freyre-Lazaro, 3 F.3d 1496, 1502 (11th Cir. 1993).  Similarly, to obtain a conviction for conspiracy to commit money laundering, the government must prove that there was an agreement to launder the proceeds of an unlawful activity and that the defendant voluntarily participated in that agreement.  United States v. Kennard, 472 F.3d 851, 856 (11th Cir. 2006), cert. denied, 127 S. Ct. 3004 (2007).  To obtain a conviction for money laundering, the government must prove that the defendant knowingly conducted a financial transaction with proceeds of an

11

unlawful activity either with the intent to promote the carrying on of the unlawful activity or with the knowledge that the transaction is designed to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds. 18 U.S.C. § 1956(a)(1)(A)(i) and (a)(1)(B)(i); see United States v. Calderon, 169 F.3d 718, 721 (11th Cir. 1999) (promotion); United States v. Majors, 196 F.3d 1206, 1211-14 (11th Cir. 1999) (concealment).

In this case, Blowe argues that she was unaware of the BMF drug and money laundering conspiracies, and, therefore, she could not have voluntarily joined them. However, evidence was presented at trial that she knew that BMF was distributing cocaine and laundering the proceeds, and that she participated by making travel arrangements, paying the bills for BMF members, improving the financial efficiency and security of the business, renting vehicles with hidden compartments, and transporting drug proceeds. Drawing all reasonable inferences and credibility choices in favor of the government, we conclude that there was sufficient evidence upon which the jury could have found that Blowe was aware of the nature of BMF's cocaine and money laundering operations and that she voluntarily participated in the conspiracies. Furthermore, there was sufficient evidence for the jury to conclude that Blowe was transporting over $66,000 with the intent to promote BMF's unlawful enterprise. Accordingly, the evidence

12

presented at trial was sufficient to support Blowe's convictions for conspiracy to distribute cocaine, conspiracy to commit money laundering, and money laundering.

B. The Court Properly Instructed Haynes's Jury on Deliberate Ignorance

"We apply a deferential standard of review to a trial court's jury instructions." United States v. Puche, 350 F.3d 1137, 1148 (11th Cir. 2003). "Under this standard, we will only reverse if we are left with a substantial and [ir]radicable doubt as to whether the jury was properly guided in its deliberations." Id. (quotation omitted). We have held that a deliberate ignorance instruction is warranted "only when [] the facts [] support the inference that the defendant was aware of a high probability of the existence of the fact in question and purposely contrived to avoid learning all of the facts in order to have a defense in the event of a subsequent prosecution." United States v. Rivera, 944 F.2d 1563, 1571 (11th Cir. 1991) (quotation omitted). The district court should not "instruct the jury on 'deliberate ignorance' when the relevant evidence points only to actual knowledge, rather than deliberate avoidance." Id. (citation omitted). We have also held, however, that instructing the jury on deliberate ignorance is harmless error where the jury could have convicted on an alternative, sufficiently supported theory of actual knowledge. Kennard, 472 F.3d at 858; United States v. Perez-Tosta, 36 F.3d 1552, 1565 (11th Cir. 1994).

13

The district court instructed the jury on the theories of actual knowledge and deliberate ignorance. With respect to deliberate ignorance, there was evidence that Haynes had frequent contact with BMF's CFO and transported large sums of cash on numerous occasions without asking questions. This evidence was sufficient to support a deliberate ignorance instruction. Even if a deliberate ignorance instruction was not warranted, it was harmless error because there was sufficient evidence to establish Haynes's actual knowledge of BMF's operation, as Haynes testified that he observed cocaine on two occasions and that he heard BMF members discussing cocaine. Therefore, the district court did not reversibly err by instructing the jury on the theory of deliberate ignorance.

### III. CONCLUSION

Darlene Blowe and Ezra Haynes appeal their convictions for conspiracy to distribute cocaine, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A)(ii); conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h); and money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and (a)(1)(B)(i), and § 2. Blowe argues that the evidence was insufficient to support her convictions. Haynes argues that the district court erred by instructing the jury on deliberate ignorance. For the foregoing reasons, we affirm Blowe's and Haynes's convictions. **AFFIRMED.**

14